# Case No. 602.

ATKINS v. FIBRE DISINTEGRATING CO.

[7 Blatchf. 555;[1] 10 Amer. Law Reg. (N. S.) 389; 4 Amer. Law T. Rep. U. S. Cts. 13; 5 Amer. Law Rev. 565.]

Circuit Court, E. D. New York. Dec. 14, 1870.[2]

ADMIRALTY—OBJECTION TO JURISDICTION —WAIVER—RESIDENCE OF CORPORATION.

1. A district court of the United States, as a court of admiralty, cannot obtain jurisdiction to proceed in personam against an inhabitant of the United States, not residing within the district, by attachment of the goods or property of such inhabitant, found therein, to compel an appearance.

[Cited in Jobbins v. Montague, Case No. 7,329.]

[See note at end of case.]

2. The cases of non-resident aliens, and of inhabitants resident within the district, but absconding therefrom, or concealed therein, distinguished.

[See note at end of case.]

3. The case of Manro v. Almeida, 10 Wheat. [23 U. S.] 473, commented on.

4. A corporation created by or under the laws of another state of the United States, is to be regarded, in reference to the point above stated, as an inhabitant of the state by or under whose laws it was so created.

[See note at end of case.]

5. An entry in the record of the district court, that, on the return day of the process of attachment, A. B. "appears for the respondent, and has a week to perfect an appearance, and to answer," does not show a submission to the jurisdiction and a waiver of objection, which precludes such respondent from insisting thereafter that the court has not, by attachment of goods, obtained jurisdiction to proceed in the cause against him.

[Cited in Louisiana Ins. Co. v. Nickerson, Case No. 8,539; Romaine v. Union Ins. Co., 28 Fed. 636.]

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

[2] [Reversing Atkins v. Fibre Disintegrating Co., Case No. 601. Id. 600. Reversed by supreme court in 18 Wall. (85 U. S.) 272.]

In admiralty. The libel in this case charged, that the respondents were a corporation, and had property in the eastern district of New York; that a charter party was executed by and between the libellants and the respondents, by which the latter chartered the ship Elizabeth Hamilton, for a voyage from the port of Kingston, Jamaica, to New York, agreeing to provide and furnish a full cargo of bamboo, in bundles five feet long and two feet square, both under and upon deck, to be stowed without dunnage, at a freight of $2.50 per bundle, payable on delivery at New York, with a further stipulation, that, if there should not be cargo enough at Kingston to load the vessel, the respondents should have the privilege of sending the vessel to a second safe port, the vessel to be fitted, provided and navigated by, and at the expense of, the libellants, and the respondents to pay demurrage at $100 per day, for any greater detention than a specified number of lay days; that the vessel proceeded to Jamaica, and was there loaded in part by the agent of the respondents, and the master was directed to proceed to Port Morant, to take in more cargo; that she did so, but, in coming out of the harbor, at the port last named, struck a reef, and was injured; and that such last named port was falsely represented by the respondents, or their agents, to the master of the vessel, to be a safe port, when, in truth, it was unsafe, unsuitable, and dangerous. The libellants claimed, that the respondents did not furnish bamboo in bundles of the length, form and size specified; that, by reason thereof, and of their irregular form, a much less number could be stowed; that the bundles in fact brought, being larger than the specification, were equivalent to a much larger number of the required size; and that, therefore, the respondents were liable for freight according to the number of bundles which might have been brought, of the precise form and size mentioned in the charter party; that is, at the rate of $2.50 for every 20 cubic feet, $10,000. They also claimed $2,000 for demurrage, for an alleged detention of 20 days, and $7,500 for compensation for the damage done to the vessel by striking the reef in the harbor of Port Morant. The prayer of the libel was, "that process in due form of law may issue against the said respondents, and that they may be cited to appear and answer, upon oath, all and singular the premises, and, if they be not found, then that a foreign attachment issue against their property within this district, and that this court would be pleased to decree in favor of the libellants, for the payment by the respondents of said sum of $19,500, besides interest and costs, and otherwise right and justice to administer in the premises."

Process was issued accordingly, commanding the marshal to cite and admonish the respondents, if found within the jurisdic-

tion of the district court, to appear on the 20th of June, 1866, to answer the libel, and, if the respondents could not be found, then to attach their goods and chattels to the amount sued for. On the return day, the marshal returned to the process, that the respondents were not found, and that he had attached all the property of the respondents in their factory, at Red Hook, in the city of Brooklyn. The record contained this entry, as a proceeding on that day: "Mr. Beebe appears for the respondents, and has a week to perfect an appearance and to answer." Thereupon, the respondents procured an order to show cause, why the property should not be discharged from the attachment, or why such other order should not be made as the court should see fit to grant. The affidavits on the part of the respondents showed, that the officers of the respondents' corporation were within the jurisdiction, and that no effort was made by the marshal to find or serve them. The affidavits produced and filed by the libellants showed, that the respondents were a corporation, incorporated by the laws of the state of New Jersey, but having a manufactory, and carrying on business, in the eastern district of New York. The record did not show any disposition of the motion, except by an order dated the 22d of March, 1867, which recited, that a motion had been made to vacate and set aside the attachment and proceedings under the same, "based upon the eleventh section of the judiciary act of 1789, [1 Stat. 78,] on the ground that the respondents are and were nonresidents of the state, and not found therein;" and such motion was, by such order, denied. The opinion of the court on the motion will be found in 1 Ben. 118, [Atkins v. Fibre Disintegrating Co., Case No. 600.] It discusses at length the jurisdiction of the court in admiralty to proceed in personam against an inhabitant of the United States, though not an inhabitant of the district, nor found therein, and sustains the power of the court to proceed by attachment of the property of such an inhabitant, and thence to a decree. Meantime, under an express agreement that it should not prejudice their motion to discharge the property, and that, if such motion should be granted, their stipulations should be cancelled, the respondents had given stipulations for value in $25,000, and the property attached was discharged from custody. After the decision of the motion, the respondents answered the libel, denying the causes of action alleged, and setting up the fact that the respondents were a corporation, incorporated under the laws of the state of New Jersey, and were not residents of the eastern district of New York, and that it was not alleged in the libel that the respondents were either in the district, or resided in the district. The cause being tried, [Atkins v. Fibre Disintegrating Co., Case No. 601,] the district court, upon the proofs, de-

creed that the libellants should recover against the respondents, for the reasons and causes mentioned in the libel, except that no claim should be allowed for injuries sustained by the libellants' vessel in Port Morant, and ordered a reference to compute the amount due. The commissioner reported $9,737 due for freight, and $1,500 for demurrage, and $1,822.26 for interest, and, thereupon, a final decree was made, that the libellants recover against the respondents, the Fibre Disintegrating Company, the sum of $13,059.26, so reported due, with $243.44, costs, as taxed, making $13,302.70, "and that judgment be, and the same is hereby, entered therefor, in favor of said libellants, against the said respondents," and that the stipulators for value cause their stipulations to be performed, &c.

Both parties appealed to this court—the respondents from the decree as made, and the libellants from the disallowance of their claim for damages by reason of the injury to the ship at Port Morant. [This decree was afterwards reversed by the supreme court in 18 Wall. (85 U. S.) 272.]

Erastus C. Benedict, for libellant.
Charles Donohue, for respondent.

WOODRUFF, Circuit Judge. The respondents insist, that the district court had no jurisdiction to proceed herein, because such respondents were not an inhabitant of the eastern district of New York, nor found therein. If the respondents are right in this, it will be wholly unnecessary to consider any question arising on the merits, on the appeal of either party.

(1) The libellants insist, that the respondents were not in a situation to raise the objection, and that, by appearance, the objection was waived. I think that in this the claim of the libellants has no sufficient foundation. The record shows, only, that, on the return day of the process, "Mr. Beebe appears for the respondents, and has a week to perfect an appearance and to answer." This ought not to be regarded as an appearance which operates as a voluntary submission to the jurisdiction and a waiver of the objection. No doubt, a general appearance and answer, without objection, is to be deemed a voluntary appearance, and is equivalent to service of process within the district. But here the respondents were allowed time to perfect an appearance, and immediately moved to set aside the proceeding; and, that being denied by the court, they were compelled to answer, and did so, by setting up the objection. It was according to the ancient practice in admiralty, in cases of attachment, not to recognize anything as an appearance but putting in of bail; and a similar practice formerly obtained in New York, in cases of attachments against foreign corporations. Although special bail be not now required in New York, it is obvious, that

neither party regarded an appearance by the respondents as perfected, and the libellants stipulated expressly that the subsequent bond for value should not operate as a waiver of the respondents' motion.

(2) Upon the important question, whether a court of admiralty in one district can obtain jurisdiction to proceed against an inhabitant of another district by attachment of his goods, the opinion of the district judge in this case shows some conflict of opinion.

The question is not affected by the circumstance that the respondents are a corporation. For the purposes of the question, a corporation must be deemed an inhabitant of the state in which it is incorporated, and it is as clearly within the reason of the rule regulating jurisdiction over inhabitants, as a natural person. I, therefore, treat the question precisely as I should if the respondents were a natural person, an inhabitant of New Jersey, sued in the eastern district of New York, by attachment of his goods, and not found nor served with process.

Had the district court, sitting in admiralty, jurisdiction to proceed in that manner against the respondents, upon the cause of action alleged? The cause of action was maritime, and, therefore, it was a subject of admiralty jurisdiction. This is not questioned by the respondents. Thereupon, the libellants insist, that it is according to the long and well-established practice of courts of admiralty, to proceed against a respondent by attachment of his goods, if he absconds from, or cannot be found within, the jurisdiction of the court, to be served with process; that, when the congress of the United States established courts of admiralty, and gave them "cognizance of all civil causes of admiralty, and maritime jurisdiction," (Act Sept. 24, 1789, "to establish the judicial courts of the United States," § 9; 1 Stat. 76,) and provided that "the forms and modes of proceedings, in causes of * * * admiralty and maritime jurisdiction, shall be according to the course of the civil law," (Act Sept. 29, 1789, "to regulate processes in the courts of the United States," § 2; 1 Stat. 93,) they sanctioned this mode of obtaining jurisdiction to proceed against a respondent, in personam, for the recovery of a demand which is, in its nature, cognizable in those courts; that this is further confirmed by the second section of the act of May 8, 1792, (1 Stat. 276,) which provides, that "the forms of writs, executions, and other process, except their style, and the forms and modes of proceeding in suits, in those of common law, shall be the same as are now used in the said courts respectively, in pursuance of the act entitled, 'An act to regulate processes in the courts of the United States,' in those of equity and in those of admiralty and maritime jurisdiction, according to the principles, rules and usages which belong to courts of equity and courts of admiralty, respectively, as contradistinguished from courts of common law; except so far as may have been provided for by the act to establish the judicial courts of the United States, subject, however, to such alterations and additions as the said courts respectively shall, in their discretion, deem expedient, or to such regulations as the supreme court of the United States shall think proper, from time to time, by rule, to prescribe to any circuit or district court concerning the same;" that, if the question were before doubtful, no such doubt can exist since the act of August 23, 1842, (5 Stat. 516,) which (section 6) gives to the supreme court of the United States "full power * * * to prescribe and regulate and alter the forms of writs, and other process, to be used and issued in the district and circuit courts of the United States, and the forms and modes of framing and filing libels, bills, answers, and other proceedings and pleadings in suits at common law, or in admiralty and in equity, pending in said courts; * * * and, generally, to regulate the whole practice of the said courts, so as to prevent delays and to promote brevity and succinctness in all pleadings and proceedings therein, and to abolish all unnecessary costs and expenses in any suit therein;" and that, by authority of the foregoing statutes, the supreme court have provided by rule, (rule 2, in admiralty,) that, where the respondent to a libel filed in admiralty cannot be found within the district, process may issue against his property in such district.

The general proposition deducible from the statutes above referred to was decided by the supreme court of the United States, in the case of Manro v. Almeida, (in 1825,) 10 Wheat. [23 U. S.] 473, and is not open for discussion in this court, namely, that the courts of the United States, proceeding as courts of admiralty and maritime jurisdiction, may issue the process of attachment to compel appearance, in cases of maritime torts and contracts.

As that is the only case in which the question appears to have been raised and passed upon in that court, and as the decision of that court is conclusive upon me, it is important to state what the case was in which the above general proposition is held, and to what precise extent the decision goes. The libel was filed in the district of Maryland, charging Almeida with having committed a tort, on board a certain vessel off the capes of the Chesapeake, in taking therefrom $5,000 in specie, and converting it to his own use. It appears, by the statement of the case, that Almeida resided in the district, but had absconded from the United States, and fled beyond the jurisdiction of the court; and the libel averred, that the libellants had no means of redress but by process of attachment against his goods, chattels and credits, which were, also, about to be removed, by his orders, to foreign parts. The goods, &c., were attached by the marshal, and a copy of the monition was left at the late dwelling-

house of Almeida, and a copy affixed at the public exchange, and on the mast of the vessel containing the attached goods, &c. On demurrer to the libel, the questions decided were raised, and, from the decision dismissing the libel, an appeal was taken to the supreme court, and the decree was reversed. The decision affirms, therefore, that it is within the power and jurisdiction of the district court, as a court of admiralty, to issue process of attachment to compel the appearance of a respondent proceeded against by a suit in personam; and that, in the United States, such process may issue against the goods of a resident of the district in which the suit is brought, whenever the defendant has concealed himself, or absconded from the country. The case of Bouysson v. Miller, [Case No. 1,709,] is referred to as an authority in this country, and Clerke's Praxis, by Hall, pt. 2, tit. 28, is cited for the general practice of the civil law. The opinion of the court shows, further, that the attachment was originally devised, and is still maintained, as a means of compelling the respondent to appear in the suit to answer, and that this is its primary object, while, if he does, nevertheless, not appear, the goods, &c., may be sold to satisfy the libellant.

In Cushing v. Laird, [Case No. 3,508,] recently decided in the district court of the United States for the southern district of New York, Judge Blatchford has examined the subject further, and concludes, mainly upon the authority of the case of Manro v. Almeida, [10 Wheat. (23 U. S.) 473,] and of the text of Clerke's Praxis, that the jurisdiction and power to attach property to compel an appearance also exists in this country, where the defendant is not an inhabitant of the United States, but is an alien not found within the district, but having property there which can be attached.

With these decisions, the case now before me raises no controversy. They are in perfect consistency with the ground relied upon by the respondents here, to wit, that, being, in a legal sense, inhabitants of the district of New Jersey, they could not be sued in the eastern district of New York, by process of attachment and seizure of their goods. And it is of great pertinency to say, that, recognizing the principles and practice sanctioned by the decisions above referred to, completely satisfies the provisions of the acts of congress already cited, and gives a proper and sufficient field for the operation of the act regulating the practice of the court, and of the rule of the supreme court of the United States prescribing the process of attachment when the defendant cannot be found within the district; for, by these decisions, if he be concealed, or have absconded, or be an alien non-resident, there is occasion for the process.

The question then recurs—and entirely without conflict with those statutes, or with the rule of the supreme court, or with those

decisions—Can an inhabitant of the United States be sued in a court of admiralty, by process of attachment of his goods, issued and served to compel his appearance, in any other district than that whereof he is an inhabitant?

The judiciary act of September 24, 1789, (1 Stat. 73,) establishes the judicial tribunals, defines their location and the times of holding courts, distributes and limits their jurisdiction, and regulates the manner of its exercise, with other details to complete the system. By the first section, the organization of the supreme court is declared. By the second, the United States are divided into judicial districts, limited and designated as therein prescribed. By the third, it is declared, that there shall be a district court in each district, and its constitution and its sessions are fixed. By the fourth, the districts (excepting Maine and Kentucky) are allotted to circuits (embracing several districts) and circuit courts in each are provided for. By the fifth, the various sessions of the circuit courts, in the respective districts, are appointed. Organization being thus provided for, the sixth, seventh and eighth sections provide for adjournments, vacancies, continuances, the appointment of clerks, their oath of office and the oath of office of the judges. Then, in section nine, the jurisdiction of the district courts is conferred, first, over certain crimes and offences; and, next, they "shall also have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, including all seizures under laws of impost * * * where the seizures are made on waters which are navigable * * * within their respective districts, as well as upon the high seas; * * * and shall also have exclusive original cognizance of all seizures on land * * * and of all suits for penalties and forfeitures incurred under the laws of the United States; and shall also have cognizance, concurrently with the courts of the several states or the circuit courts, as the case may be, of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States; and shall also have cognizance, concurrent as last mentioned, of all suits at common law where the United States sue and the amount in dispute amounts, exclusive of costs, to the sum or value of cne hundred dollars; and shall also have jurisdiction, exclusively of the courts of the several states, of all suits against consuls," &c., &c. The tenth section gives to the district court in Kentucky certain circuit court powers.

The eleventh section defines the jurisdiction of the circuit courts and provides as follows: "The circuit court shall have original cognizance, concurrent with the courts of the several states, of all suits of a civil nature at common law or in equity, where the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars, and the United States are plaintiffs or petitioners, or

an alien is a party, or the suit is between a citizen of the state where the suit is brought and a citizen of another state; and shall have exclusive cognizance of all crimes and offences cognizable under the authority of the United States, except where this act otherwise provides, or the laws of the United States shall otherwise direct, and concurrent jurisdiction with the district courts of the crimes and offences cognizable therein." Then follow two provisions, the effect of which is especially important to the question under consideration: "But no person shall be arrested in one district, for trial in another, in any civil action before a circuit or district court. And no civil suit shall be brought before either of said courts, against an inhabitant of the United States, by any original process, in any other district than that whereof ne is an inhabitant, or in which he shall be found at the time of serving the writ."

The further and other provisions of the statute it is unnecessary to recite, as they do not bear on the question. But it is of some significance to note, that the constitution of the United States had already provided, (article 3, § 2, subd. 3,) that "the trial of all crimes, except in cases of impeachment, * * * shall be held in the state where the said crime shall have been committed;" and an amendment, (article 6,) proposed by the same congress, and at the same session, at which the judiciary act was passed, provides, that, "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed."

That an attachment of goods to compel appearance, and a holding thereof to answer any claim which a plaintiff may recover, is "original process," within the meaning of the language of the statute above quoted, is not doubtful. That the circuit and district courts of the United States cannot send their process into another district, in suits at common law or in equity, and thereby obtain jurisdiction of the person, is also clear. That, in actions at the common law or in equity, they cannot proceed by attachment, and so obtain jurisdiction of a person who is an inhabitant of another district, is settled. Indeed, it is not here denied, by the counsel for the libellants, that, in such actions, the statute applies according to its very terms; and that, in order to jurisdiction, the defendant must be an inhabitant of the district in which the suit is brought or be found therein, if the defendant be an inhabitant of any of the United States. Picquet v. Swan, [Case No. 11,134;] Toland v. Sprague, 12 Pet. [37 U. S.] 300; Ex parte Graham, [Case No. 5,658;] Hollingsworth v. Adams, [Id. 6,611;] Day v. Newark India Rubber Co., [Id. 3,685,] which applies the principle to a corporation created by the laws of another state; Sayles v. North West-

ern Ins. Co., [Id. 12,421.] If, then, the present is a "civil suit," within the meaning of the act, there is an end of the question; and jurisdiction of the defendant could not be acquired by attachment of goods.

1. The restriction cited, and which forms part of the eleventh section, is not confined, in its operation, to the jurisdiction conferred by that section. This is clear, because, no civil jurisdiction is, by that section, conferred upon the district courts; and yet the restriction forbids that any civil suit shall be brought before either the district or circuit court in any other district, &c. The words "district court" and "either of said courts" would be senseless and inoperative, if the restriction did not apply to other actions than those which were authorized by that section. The terms, therefore, plainly apply to the district court in the exercise of some jurisdiction theretofore mentioned, and must operate to limit or explain the powers given to those courts in the previous ninth section. Including both courts in terms, the limitation operates upon the jurisdiction of each conferred by that section. This is also settled by the cases cited; for, if it were otherwise, then the district court could, in the exercise of such common law jurisdiction as is given by the ninth section, proceed by attachment.

2. The congress of the United States, when this restriction was imposed, were in the very act of framing a judicial system. They provided for the organization of the courts, for a distribution thereof throughout the states, bringing the federal tribunals within easy approach by every citizen, for the determination of controversies deemed appropriate to those tribunals. Their jurisdiction as to subject matter was made to depend chiefly upon the nature of the subjects and the residence of the parties, who, when of different states, might prefer a tribunal existing and acting in freedom from state influence. The courts of original jurisdiction were located in each district. As they acted not under local authority, but derived their power from a government embracing the entire Union, they might seem warranted in entertaining suits against defendants residing in any state, however remote, and in sending process for service compelling appearance. It was, therefore, of great and manifest importance, that some rule on this subject should be prescribed; and it was done so as to prevent parties proceeded against from being called to a great distance to defend actions brought against them, when there was a federal tribunal at their own door competent to administer justice.

3. There is, therefore, no possible reason for any distinction in this respect between a suit in admiralty and a suit in equity or a suit at law. A suit in personam in the court of admiralty is within the jurisdiction of that court, when founded on a maritime contract, or prosecuted for a marine tort.

But no reason can be stated for requiring a party living in New Orleans or San Francisco, to come to New York to defend an action or suit on the covenants in a charter party, when he ought not to be required to come there to defend a suit at law or in equity founded on any commercial or common law contract. For a marine tort committed by a resident of New Orleans, he is liable at common law, and may also be held liable in the court of admiralty. There is no just reason for holding him to answer in such case in any district court of the United States, however remote, if the plaintiff elects to proceed in admiralty, while, if the plaintiff proceeds at common law, he must sue in the district of the defendant's residence, or in the district in which he may be found. The reason of the act of congress includes suits in personam in admiralty, as fully as in equity or at law.

4. The word "civil" is used in the act in distinction from "criminal." In the 9th and 11th sections, conferring jurisdiction on the district and circuit courts, congress had spoken of "crimes and offences," "civil causes of admiralty and maritime jurisdiction," "suits for penalties and forfeitures," "causes where an alien sues for a tort," "suits at common law," "suits against consuls" other than "for offences," and "suits of a civil nature at common law or in equity." They then declare that "no civil suit" shall be brought, &c. A civil cause of admiralty and maritime jurisdiction is prosecuted by a suit. It is within the terms of the restriction as closely as a cause "where an alien sues for a tort." It was wholly unnecessary, in the restrictive clause, to recite again the several terms previously employed, as suits for forfeitures, suits against consuls, suits at common law, &c., and civil causes in admiralty. These are all civil in their nature. A cause in admiralty is so expressly described. It is a civil cause. The general term "civil suit" was apt to describe all these actions and causes of action, and it was so employed. And, as the constitution provided that criminal prosecutions, jurisdiction whereof was given by this act to the circuit and district courts, should be had in the state where the crime was committed, so, also, civil suits against an inhabitant of the United States were required to be brought in the district whereof he was an inhabitant. Jurisdiction of crimes and offences, as well as of proceedings of a civil nature, being conferred on these courts by the sections mentioned, this classification, by the word "civil," as distinguished from "criminal," was an essential conformity to the constitutional requirement, that crimes and offences should be prosecuted where committed. The restriction, therefore, made the system in this respect complete.

5. This view of the effect of this statute, securing to inhabitants of the several states the right of being sued within the district whereof they are respectively inhabitants, is, therefore, in perfect consistency with the claim, that courts of admiralty have general power to proceed in personam by attachment of goods, where the defendant cannot be found within the district, so far as that is asserted in Manro v. Almeida, 10 Wheat. [23 U. S.] 473; in King v. Shepherd, [Case No. 7,804;] in Boyd v. Urquhart, [Id. 1,750;] or in Bouysson v. Miller, [Id. 1,709.] The limitation is the result of the act of congress, and does not deny the original jurisdiction or practice of those courts, or their present power or jurisdiction where the respondent is an alien non-resident, or, being an inhabitant of the district, conceals himself or absconds, so that he cannot be found.

6. To the suggestion, that the acts of congress regulating the process and practice of the courts are in such general terms that they and the rule of the supreme court in admiralty have operated to modify the act of 1789 limiting jurisdiction in this respect, it is sufficient to say, that these acts are not designed to alter or enlarge the jurisdiction of the courts, but only to regulate the exercise of jurisdiction where it exists. I understand this to be distinctly affirmed in Toland v. Sprague, already cited. Indeed, if these acts are held to authorize the supreme court in any respect, by rule, to abrogate the restriction in the act of 1789, it cannot be confined to the jurisdiction of courts of admiralty. For, the act of 1842 (relied upon as above) gives the same power touching proceedings at the common law and in equity as in admiralty; and the construction and effect contended for would enable that court practically to repeal all the restrictions contained in the act of 1789 on this subject, and to authorize common law actions against inhabitants of any state to be brought in any district of the United States.

Of the cases of Clark v. New Jersey Steam Nav. Co., [Case No. 2,859,] and New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 344, it is sufficient to say, that the point discussed in this case was neither raised nor decided in either; and the first named case is full to the effect above asserted, that, on this question, a corporation stands in the same position as a natural person. The effect of the eleventh section of the judiciary act on the power of the court to proceed against either, was not raised, discussed or decided. The decision in the last named case related, first, to the merits, and, second, to the inquiry whether the case was, in its nature, cognizable in a court of admiralty. The synopsis of the case first named, as reported, would suggest that the point in question was decided adversely to the views I have expressed; but, in truth, the point was not raised, the opinion stating that it had not been doubted, and referring to the general doctrine of Manro v. Almeida, [supra,] with which my views are in no conflict.

The case last referred to suggests what is, perhaps, sufficiently obvious without discussion, that the jurisdiction of courts of admiralty by libel and process in rem is in no conflict, but is in entire harmony, with the views I have expressed. In those cases, the court has jurisdiction of the rem wholly irrespective of the question to whom it belongs. For all the purposes of the proceeding, the liability rests upon the rem, and it is made to answer. In form and in substance, that and that only is charged. It is a proceeding for the enforcement of a maritime lien already existing, or acquired by the seizure of the subject of the lien, and to be enforced against it, without regard to questions of title or ownership; and one who intervenes as claimant does so, not to defend himself from liability, but for the protection of the rem proceeded against. Nor is the right of intervention at all confined to one who is liable upon the same cause of action. Such a proceeding, in very form adverse, not to an inhabitant of the United States, but to a rem or subject within the district, upon which the liability was chargeable, was so clearly according to the established jurisdiction and practice of courts of admiralty, that it must have been recognized by congress, and neither the words of the act, nor any reasonable implication therefrom, affect it.

I have examined the opinion of Judge Shipman, of the district court for Connecticut, in Blair v. Bemis, [Case No. 1,484,] in admiralty, (August, 1863,) and that of Judge Hoffman, of the district court of California, in Wilson v. Pierce, [Id. 17,826,] and am constrained to concur in their conclusion. Their opinions embody many of the views I have suggested, and very ably, I think, present most of the considerations pertinent to the subject, with the authorities.

In the opinion of the district court in this case, the opposite conclusion is ably sustained, and the practice, said to be of long standing in the southern district of New York, is stated to be in conformity with such conclusion. If I could satisfy myself that such practice was not forbidden by the judiciary act, I should prefer to make no decision disturbing such practice. I have, therefore, retained the case for further and more deliberate consideration, longer than I should otherwise have deemed necessary. I am, however, by my convictions, compelled to concur with the conclusions of Judges Hoffman and Shipman, and to hold, that jurisdiction of the defendants was not acquired by the district court, by the attachment in this case.

The decree herein must, therefore, be reversed, and the stipulators be discharged from their stipulations provisionally given.

[NOTE. This decree was reversed by the supreme court. Mr. Justice Swayne, delivering the opinion, said: "This controversy turns upon the 11th section of the judiciary act of 1789. * * * The prohibition to bring a civil suit in a district other than that whereof he is an inhabitant, or in which he shall be found, is the hinge of the controversy between these parties. * * * It may be admitted that an admiralty case is a 'civil suit,' in the general sense of that phrase. But that is not the question before us. It is whether that is the meaning of the phrase as used in this section. The intention of the lawmaker constitutes the law, * * * and, in a case of doubt, that is to be sought from the entire context of the section, statute, or series of statutes in pari materia. * * * The first paragraph of the 11th section defines the jurisdiction of the circuit court as extending to 'all suits of a civil nature, at common law, or in equity, where,' etc. The criminal jurisdiction of the circuit court is next defined. Then follows the provision that no one shall be arrested in one district for trial in another 'in a civil action' before a circuit or district court; and next the prohibition here in question. Construing this section down to the second prohibition, inclusive, by its own light alone, we cannot doubt that by the phrase 'civil suit,' mentioned in this prohibition, is meant a suit within the category of 'all suits of a civil nature, at common law or in equity,' with which the section deals at the outset. * * * We think the conclusion is inevitable that the terms 'civil suit,' in the 11th, and 'civil actions,' in the 22nd, section, were intended to mean the same thing. The meaning of the phrase employed in the latter admits of no doubt: The language there is 'civil actions,' and it is used to distinguish them from 'causes of admiralty and maritime jurisdiction,' provided for in the preceding section. The 21st and 22nd sections are in pari materia with the 11th, and throw back a strong light upon the question arising under the latter. We think it dispels all darkness and doubt if any could otherwise exist upon the subject." Directions were given to affirm the decrees of the district court. Atkins v. Fibre Disintegrating Co., 18 Wall. (85 U. S.) 272.]